UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

JERRY A. WADE, Individually     * CIVIL ACTION NO.
and on Behalf of the Class,     *
                                *
VERSUS                          *
                                * JUDGE:
COX COMMUNICATIONS              *
LOUISIANA, LLC and              *
COXCOM, INC.                    * MAGISTRATE:

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF</u>

Plaintiff, JERRY WADE, on behalf of himself and all others similarly situated, alleges as follows:

### <u>INTRODUCTION</u>

1.      Plaintiff Jerry A. Wade brings this class action suit on behalf of himself and all others similarly situated for damages because of the failure of Defendants Cox Communications Louisiana, LLC and CoxCom, Inc. (collectively "Cox") to provide internet services as advertised and promised.

2.     In particular, although Cox offers high-speed internet services at different tiers or speeds, in many areas across the state it simply cannot provide those services to its subscribers at speeds that are remotely close to the speeds it promises.  Importantly, the nodes that distribute services in certain geographical areas are over-saturated and are incapable of producing the services promised to its customers.

3.     Accordingly, on behalf of himself and all other subscribers of Cox internet services in over-saturated service areas, Wade seeks damages associated with the failure to provide services as promised or advertised.

## JURISDICTION AND VENUE

4.     This Honorable Court has sole and exclusive jurisdiction pursuant to 28 U.S.C.A. § 1332.  This action involves one party who is domiciled in the state of Louisiana and the others in the states of Delaware and Georgia.  Plaintiff and the class members have used Cox services in this District and all of the class members are domiciled in this state.

5.     In addition, the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because (a) at least one member of the putative class is a citizen of a state different from Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions under that subsection apply to this action.

2

## PARTIES

6.      Plaintiff, Jerry A. Wade, is a resident of Livingston Parish, State of Louisiana. He first purchased a high speed internet services package from Defendants in 2008 and remains a subscriber of their services.

7.      Defendant, Cox Communications Louisiana, L.L.C. ("Cox Louisiana") is a Delaware limited liability company with its principal place of business in Atlanta, Georgia and is registered to do business in Louisiana. At all relevant times it distributed, marketed and/or sold high speed internet services throughout the United States, including this District, to Plaintiff and the class members but failed to provide the services as purchased or advertised.

8.      Defendant, CoxCom, Inc. ("CoxCom "), is a Delaware corporation with its principal place of business in Atlanta, Georgia and is registered to do business in Louisiana. At all relevant times it distributed, marketed and/or solds high speed internet services throughout the United States, including this District, to Plaintiff and the class members but failed to provide the services as purchased or advertised.

9.      Collectively, Cox Communications Louisiana, LLC and CoxCom, Inc. are referred to as "Cox."

10.      At all relevant times, each defendant was the agent, servant, employee, co-conspirator and/or joint venturer of each of the other defendants.  In doing the things alleged in the cause of action stated herein, each and every defendant was acting within the course

and scope of this agency, employment, conspiracy, and/or joint venture, and was acting with the consent, permission and authorization of each of the other defendants.  All actions of each defendant, as alleged in the causes of action stated herein, were ratified, approved and/or authorized by every other defendant with full knowledge of such acts.  Defendants are thus jointly and severally liable for such actions.

## GENERAL ALLEGATIONS

11.    Cox advertises a three-tiered high-speed internet provider service ("the Service"), that  purportedly provides a customer the ability to "[e]njoy email, music, movies and more at high speed" and invites customers to "[g]o high speed."[1]

12.    The speed at which a user is able to access the Internet is one of the most important aspects of Internet service.  Internet access speed is particularly important for individuals who download and/or upload large files such as music and video files.

13.    Cox is the only available broadband internet services in many areas throughout Louisiana, including, but not limited to Livingston Parish.  Cox is the third largest cable provider in the United States and services over 6.2 million customers throughout the United States.

14.    Cox services its customers by area.  Each designated area has a "node" which provides the high speed internet service to a specific number of customers.

---

[1]  http://ww2.cox.com/residential/greaterlouisiana/home.cox (12/6/10).

4

15.     However, because of increased household internet usage, these nodes may become saturated or over-saturated.  This over-saturation can directly effect the internet speeds that Cox can offer to a specific area.

16.     Because of the over-saturation, Cox is forced to split the nodes to decrease the number of customers that are serviced per node.

**The Cox Three-Tiered High Speed Internet Service**

17.     Cox advertises three separate tiers of high speed internet services to customers: Essential, Preferred and Premier.

18.      The Essential service is advertised to provide "[s]peeds up to 3 Mbps, ideal for email and simple surfing."[2]  Cox offers these services for $32.99/month.

19.     The Preferred service is advertised to provide "[s]peeds up to 18 Mbps with PowerBoost®, great for music and photos."[3]  Cox offers these services at $45.99/month and boasts  "[d]ownload in seconds, not minutes . . ."[4]

20.     The Premier service offers "[s]peeds up to 30 Mbps with PowerBoost®, perfect for gaming and movies."[5]  Cox offers this service at $58.99/month and states that this service

---

[2]  http://ww2.cox.com/residential/greaterlouisiana/internet.cox (12/6/10)

[3]  http://ww2.cox.com/residential/greaterlouisiana/internet.cox (12/6/10)

[4]  http://ww2.cox.com/residential/greaterlouisiana/internet/preferred-internet.cox (12/6/10)

[5]  http://ww2.cox.com/residential/greaterlouisiana/internet.cox (12/6/10)

has "downloads 50% faster than Preferred" and that "premier offers our top speeds for super large downloads and uploads."[6]

**Cox Advertising Scheme**

21.     Cox employs a wide-ranging national advertising campaign that includes use of television, radio, print, direct mail and billboard advertising.  In the markets in which Cox operates, the advertising of the Service is pervasive and unavoidable.

22.     Cox's advertising and marketing of the Service are centered on the speed of the Service.  For example, Cox makes the following representations concerning the Service in their advertising, including on their internet web site:

– 	High Speed Internet Preferred

	Our most Popular Internet Option

	You're busy.  The last thing you want to do is wait for the Internet to load.  That's why Preferred Internet is optimized to handle your broadband needs like online shopping, banking or downloading music and photos.  Plus, PowerBoost® gives our already fast download and upload speeds an extra boost when you need it most.

	* * *

	How fast is fast?  Download in seconds, not minutes and PowerBoost® gives you a temporary boost of speed when transferring large files.[7]

– 	High Speed Internet Premier

---

[6]  http://ww2.cox.com/residential/greaterlouisiana/internet/premier-internet.cox (12/6/10)

[7]  http://ww2.cox.com/residential/greaterlouisiana/internet/preferred-internet.cox (12/6/10)

Top Speeds for elite Internet users

If being online is part of your lifestyle, Premier Internet is your package. Premier offers our top speeds for super large downloads and uploads.  It is optimized to handle the toughest online tasks, like online gaming, streaming movies and videos.  PowerBoost® gives Premier that extra boost of speed when you're downloading a large movie file or uploading a series of digital pictures.

* * *

How fast is fast?  With downloads 50% faster that Preferred and PowerBoost® gives you a temporary boost of speed when transferring large files.[8]

23.     As a result of Cox's pervasive advertising, Plaintiff and the Class have been repeatedly bombarded with the Defendants' advertisements and speed representations.  For example, in 2006 Cox launched a media blitz to tout the "Power Boost" function of the Service, which Cox claimed would significantly increase the speed of the Service for customers like Plaintiffs and the Class who use the Service to upload and download large files.  Cox's advertising of PowerBoost was so pervasive that it received coverage in several media outlets.  For example:

–       Cox Hypes 'PowerBoost' Speeds

        By Steve Donohue – Multichannel News, 12/20/06 10:49:00 AM MT

        Cox Communications said it is rolling out technology that allows Web surfers to temporarily increase Internet download speeds for large files such as videos.

        Comcast was the first operator to market PowerBoost – which can reportedly temporarily double Internet speeds for a few seconds – in June.

---

[8]  http://ww2.cox.com/residential/greaterlouisiana/internet/premier-internet.cox (12/6/10)

Cox said it launched PowerBoost in its northern Virginia system Wednesday, and it will roll the technology out on other systems "on a market-by-market basis."

The Atlanta-based operator added that PowerBoost – which uses Cable Television Laboratories' Data Over Cable Service Interface Specification – will increase the speed of the Preferred 5-megabit-per-second service by as much as double, to 10 mpbs, and its 15-mpbs Premier service will increase by as much as 33%.

Comcast is using the technology to temporarily double the speeds of subscribers that receive its 6 mbps service to 12 mbps and its 8 mbps service to 16 mbps.

– PowerBoost(TM) Makes Cox High Speed Internet Service Even Faster

Cox Customers Now Enjoy Automatic and Free Additional Bursts of Speed When Downloading Large Files

(ATLANTA) - Cox Communications announced today the widespread deployment of PowerBoost$^{TM}$, a new technology that gives customers an added burst of speed when downloading large files.  This enhanced feature is available in Cox markets today.

Customers who have Cox's Preferred or Premier High Speed Internet services now experience even greater speeds when downloading large files, thanks to the addition of PowerBoost$^{TM}$.  This intelligent speed enhancement technology uses additional capacity on Cox's local fiber-hybrid network to automatically give customers a burst of speed above and beyond what they used to experience for faster file downloads. The PowerBoost$^{TM}$ feature is free for all Preferred and Premier package customers.

"Launching PowerBoost$^{TM}$ reaffirms our commitment to being a friend to our customers in the digital age.  We're giving our customers the ability to tap into our powerful hybrid network and put it to work for them when they need it most." stated Steve Gorman, vice president of Marketing for Cox High Speed Internet.  "Customers choose our broadband service because it offers the best combination of speed and features for their money, and this enhancement gives them even more of what they've come to expect from Cox."

PowerBoost offers a short burst of additional speed when downloading large files, such as movies, pictures or music. PowerBoost technology automatically detects when a customers begins a large file download, regardless of file type, and jumpstarts the download with a burst of speed, when extra network capacity is available. Speeds will be boosted up to 29% for Preferred customers and up to 25% for Premier customers.

24.    Cox continues to broadcast marketing efforts, including one disseminated in Louisiana that states the following: "Cox ...... fastest internet period."

25.    In addition, television ads in Louisiana promise a "high speed internet performance pledge," although the terms of that pledge are not defined in the advertisement or in any materials disseminated by Cox.

26.    All of these advertisements represent the significant speed by which its services are provided. However, Cox's advertisements regarding specific speeds are false and misleading because over-saturated nodes, such as the one in Watson, Louisiana, cannot provide the high speeds advertised or provide services consistent with its multiple and repeated advertisements and representations. Likewise, the warranties and promises made by Cox cannot be met to many of its subscribers because of this problem.

**The Cox Subscriber Agreement and Policies**

27.    Cox has numerous policies, terms of service and/or terms of use posted on their website. At the time a potential subscriber attempts to purchase the Service on Cox's website, the subscriber is required to check two "Customer Authorization" boxes confirming that they have read and accepted the Cox Terms and Conditions of Service, Subscriber Agreement, and Acceptable Use Policy.

9

28.     Following the links provided to each of these documents, a new browser window is opened and the subscriber is directed to the Cox Subscriber Agreement (the "Agreement"). Potential subscribers, however, are not in fact required to follow these links or to actually read the Agreement in order to "check" the authorization boxes prior to subscribing to the Service.

29.     The Agreement is presented as "take it or leave it" – "IF YOU DO NOT AGREE TO BE BOUND BY THESE TERMS, YOU SHOULD IMMEDIATELY STOP THE USE OF THE SERVICES AND NOTIFY THE COX CUSTOMER SERVICE DEPARTMENT SO THAT YOU ACCOUNT MAY BE CLOSED" and "IF YOU DO NOT ACCEPT THESE TERMS AND CONDITIONS DO NOT INSTALL AND/OR ACTIVATE THE COX SERVICE."   The adhesiveness of Cox's contract is exacerbated by the fact that Cox has a virtual monopoly for cable high speed internet service in the markets they serve.

30.     When presented with these different documents referencing the terms of use of the Service, it is not easy to determine what, if any, contract applies to the Service. However, all of the different terms of service promise that Cox will provide the Service. The terms of service explicitly promise specific Internet access speeds and Cox charges more for faster speeds.  Given that each progressive tier of the Service costs more and because Cox promises higher maximum speeds for each progressive tier, Plaintiff and the other members of the class reasonably believe that each tier of the Service will attain a minium speed that is at least as fast to the maximum speed promised for the tier below.

10

31.     Customers agree to pay all charges, damages, costs and fees monthly upon the date provided by Cox.   Customers also agree to comply with minimum computer requirements and installation services and to use Cox software and services only as directed.

32.     In exchange for the payment of monthly service fees to Cox and compliance with the various terms of use, Cox agrees to provide the services requested by the customer with the goal of providing the customer "with an enriched, high-quality internet experience." Specifically,  the Subscriber Agreement "sets forth the terms and conditions under which CoxCom, Inc. d/b/a Cox Communications, together with any Cox Communications affiliate and/or distribution partner agrees to provide the Cox® High Speed Internet SM service to [the customer.]" Further, the subscription "entitles [the customer] to use the Service."

33.     Cox buries within the Subscriber Agreement the right to manage the network "for the greatest benefit of the greatest number of subscribers."

34.     By specifically enumerating the circumstances in which they reserve their right to manage the network, Cox implicitly promises Plaintiffs that they will otherwise have unlimited use of the Service at the promised speeds.

35.     Plaintiffs have performed their obligations under the terms of the agreements with Cox by paying their monthly charges and by not engaging in activities that are prohibited by the Agreement.

36.     However, through its "management" of the network, Cox has created a system that cannot service many of its customers.   The over-saturated nodes in areas, such as

11

Watson, Louisiana, cannot provide even the most minimal advertised mbps for any customers whose service is linked to that node.  Cox is slow to address the over-saturation issue, and all customers suffer because of this neglect.

    37.    The Agreement also provides that it "is governed by the laws of the state in which [the customer's] billing address in [Cox's] records is located and applicable federal law."  Further, "[a]ll court proceedings and arbitration must be in the country and state in which [the customer's] billing address in [Cox's] records is located."

**The FCC Findings**

    38.    Although Cox agrees to provide the services requested by the customer, the FCC found that as of 2009, internet speed provided by companies such as Cox were roughly 50% of the advertised speeds.[9]

    39.    Through extensive research and testing, the FCC determined that in 2009 US residential households subscribed to internet services with a median advertised download speed of 7-8 Mbps. Such advertisements are the only performance-based data that the average consumer receives before making the decision to purchase a service.

    40.    In contrast, the 2009 average actual download speeds was roughly 3-4 Mbps. As stated by the FCC, "[t]he actual speed that consumers experience influences their ability to access and utilize applications and content."

---

[9]  Broadband Performance, OBI Technical Paper No. 4, Federal Communication Commission.

41.   This startling data prompted the FCC to propose broadband measurement standards to more accurately state the broadband speed available to consumers.  These standards will likely include:

–   Actual speeds and performance over the broadband service providers network and end-to-end points of the connection,

–   Actual speeds and performance at peak-use hours,

–   Actual speeds and performance achieved with a given probability over a set time period that includes peak usage times, and

–   Actual speeds and performance tested against a given set of standard protocols and applications.

42.   The FCC findings have been the subject of numerous media articles, including:

–   Your fears confirmed: "up to" broadband speeds are bogus

By Nate Anderson - Last updated August 17, 2010 3:29 PM

Broadband providers in the US have long hawked their wares in "up to" terms. You know "up to" 10 Mbps, where "up to" sits like a tiny pebble beside the huge font size of the raw number.

In reality, no one gets these speeds.  That's not news to the techno-literate, of course, but a new Federal Communications Commissions report shines a probing flashlight on the issue and makes a sharp conclusion: broadband users get, on average a mere 50 percent of that "up to" speed they had hoped to achieve.

After crunching the data, FCC wonks have concluded that ISPs advertised an average (mean) "up to" download speed of 6.7 Mbsp in 2009.  That's not what broadband users got, though.

"However, FCC analysis shows that the median average speed consumers experience in the first half of 2009 was roughly 3 Mbps, while the average (mean) actual speed was approximately 4 Mbps," says the report.  "Therefore

actual download speeds experienced by US consumers appear to lag advertised speeds by roughly 50 percent." * * *

–        Mixed Signals: your Internet Access Isn't as Fast as Your ISP Says It Is

A new FCC Study shows that your access to the Internet is up to 50 percent slower than advertised.

By: Michael Koretzky, Aug. 23, 2010, www.moneytalksnews.com

When your Internet service provider (ISP) boasts about how fast you can access the web, it turns out they're playing slow and loose with the truth.

A new report by the Federal Communications Commission shows that those advertised speeds are off by roughly 50 percent.

FCC researches studied those much-hyped "up to" claims – the ones that breathlessly advertise "up to 10 Mbps when you use our service!" * * *

Their findings were buried in a 30-page report called "Broadband Performance: OBI Technical Paper No. 4."  They found that last year, U.S. customers who subscribed to broadband in their homes were told they'd get "average (mean) and median advertised download speeds of 7-8 Mbps.:

What they really got wasn't even close . . .

"FCC analysis shows that average (mean) actual speed consumers received was approximately 4 Mbps, while the median actual speed was roughly 3 Mbps in 2009.  Therefore actual download speeds experienced by U.S. consumers lag advertised speeds by roughly 50 percent." * * *

**Plaintiff's Dealings With Cox**

43.    Plaintiff Jerry Wade's experience is typical of those he seeks to represent in this action.  Plaintiff purchased the Premier internet package sometime in 2008.

44.    Wade is a resident of Watson, Louisiana and was one of the first internet cable subscribers from that area.

45.    Wade updgraded his service from "Preferred" to "Premier" service to increase bandwith and increase internet speeds.

46.    However, about a year after the increase, Wade noted incredibly slow internet speeds during peak hours – 3:00 - 10:00 PM.

47.    He began to perform speed tests on the internet service at all times and noted that the internet speeds drastically decreased during peak hours.  He was only able to reach speeds close to those advertised in the Premier package outside of the peak hours.  During peak hours, he was able to reach only around 1.5 mbps, which is less than 10% of the advertised speeds for the Premier package.

48.    Wade contacted Cox about the problem and, after numerous unsuccessful conversations with Cox's technical support services, took his problems to upper management.

49.    In response to his conversations with members of upper management at Cox in Louisiana, Cox sent a technician to his home.  The technician confirmed that Wade's equipment was in proper working order but replaced some connectors to assist with the internet speed.

50.    The technician admitted to Wade that the node in the Watson, Louisiana area was over-saturated.  However, the node was not on the schedule to be split.   He also admitted that Cox could not provide the Premier service that Wade had purchased unless the

15

node was split.  The best that Cox could provide on the over-saturated node was the lowest tier of service.

51.   Wade provided the technician with a year's worth of speed test data that showed the poor performance of the Service in his area.

52.   At the request of the technician, Wade continued to run speed tests on the internet service and provided additional data to Cox that showed their poor internet speed in his service area.

53.   Indeed, because Cox could not provide Wade with the service he purchased, Cox stopped charging Wade for the high speed internet service in September of 2010. However, Wade spent $58.99/month, a $26.00 up charge,  for high speed internet service he did not receive for more than two years.

54.   Although, upon information and belief, the node servicing Wade's Services was split on or about January 13, 2011, he has experienced no increase in the speed of his service.

55.   The node servicing Wade's neighborhood is not the only over-saturated node operated by Cox.  In fact, other nodes across the state are similarly over-saturated and generate Services at speeds less than advertised or promised.  Wade seeks to represent a class compiled of Cox customers whose Services are received from an over-saturated node.

## CLASS ALLEGATIONS

56.     Plaintiff brings this class action pursuant to Federal Rule of Civil Procedure

23 on behalf of himself and all other persons similarly situated.

57.     The class that Plaintiff seeks to represent is defined as follows:

All subscribers to Cox internet services in Louisiana who paid for internet
services within the past five years and whose service does not meet the speeds
advertised by Cox and/or whose internet service was or is provided by an over-
saturated node.

58.     Excluded from the class are the following:

    a.    Cox, its subsidiaries, affiliates, officers, directors, and employees;

    b.    persons who have settled with and validly released Cox from separate,
non-class legal actions against Cox based on the conduct alleged
herein;

    c.    counsel, and the immediate families of counsel, who represent Plaintiff
in this action;

    d.    the judge presiding over this action; and

    e.    jurors who are impaneled to render a verdict on the claims alleged in this
action.

59.     Upon information and belief, the proposed class comprises thousands of

members.  Cox currently has over 6.2 million customers nationwide. Therefore, the class is

so numerous and geographically dispersed throughout the State of Louisiana that joinder of

all members in one action is impracticable.

60.     Cox has acted with respect to Plaintiff and members of the proposed class in

a manner generally applicable to each of them.  There is a well-defined community of interest

in the questions of law and fact involved, which affect all class members.  The questions of law and fact common to the class predominate over the questions that may affect individual class members, including the following:

     a.     whether Defendants advertise and market the Service by promoting a speed at which its customers may download and upload data from the Internet;

     b.     whether Defendants' contract promises specific Internet speeds and speed tiers;

     c.     whether there is an enforceable written contract between Defendants and the Class;

     d.     whether Defendants' marketing and advertising is likely to deceive the Class;

     e.     whether Defendants' conduct violates the consumer protection laws alleged herein;

     f.     whether members are entitled to compensatory, statutory, treble and/or punitive damages; and

     g.     whether members are entitled to injunctive and other equitable relief.

61.    Plaintiff's claims are typical of the claims of all members of the class he proposes to represent in this action.

62.     Plaintiff will fairly and adequately represent and protect the interests of the class, and does not have interests that are antagonistic to or in conflict with those he seeks to represent.

63.     Plaintiff has retained counsel who have extensive experience in the prosecution of class actions and other forms of complex litigation.

64.     In view of the complexity of the issues and the expense that the individual plaintiff would incur if he or she attempted to obtain relief from a large, transnational corporation such as Cox, the separate claims of individual class members are monetarily insufficient to support separate actions. Because of the size of the individual class members' claims, few, if any, class members could afford to seek legal redress for the wrongs complained of in this Complaint.

65.     The class is readily definable, and prosecution as a class action will eliminate the possibility of repetitious litigation and will provide redress for claims too small to support the expense of individual, complex litigation. Absent a class action, class members will continue to suffer losses, Cox's violations of law will be allowed to proceed without a full, fair, judicially supervised remedy, and Cox will retain sums received as a result of its wrongdoing. A class action will provide a fair and efficient method for adjudicating this controversy.

66.     The prosecution of separate claims by individual class members would create a risk of inconsistent or varying adjudications with respect to thousands of individual class

members, which would, as a practical matter, dispose of the interests of the class members not parties to those separate actions or would substantially impair or impede their ability to protect their interests and enforce their rights.

67.     The proposed class satisfies the certification criteria of Federal Rule of Civil Procedure 23.

## CLAIM FOR RELIEF

### Count 1 - Violation of Louisiana Unfair Trade Practices Act, La.R.S. 51:1401, *et seq.*

68.     Plaintiff re-alleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

69.     This claim for relief is brought pursuant to the Louisiana Unfair Trade Practices Act ("LUTPA"), La.R.S. 51:1401, *et seq.* Plaintiff and the class members are "consumers," as that term is defined by La.R.S. 51:1402(1).

70.     The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purposes of the LUTPA, and were undertaken by Cox in transactions intended to result in, and which resulted in, the sale of goods to consumers.

71.     By engaging in the conduct alleged herein, Cox has violated the LUTPA by, *inter alia*, charging customers for a service that it cannot provide. In particular, Cox promised internet services at speeds it cannot deliver.

72.     In actuality, and unbeknownst to Plaintiff and members of the proposed class, Cox could not provide such services when the customer areas experienced an over-saturation of the nodes.  Customers, such as Wade, although having purchased the Premier service, did not ever access speeds to justify the higher charge.

73.     By engaging in this conduct, Cox has also advertised, and continues to advertise, services with no intent and the inability to provide the services as advertised. Additionally, Cox has violated and continues to violate the LUTPA, by engaging in the conduct alleged herein, including, but not limited to:

–     Advertising and charging customers for services that, because of its lack of sufficient hardware and equipment, it cannot perform in all areas;

–     Failing to communicate to potential and existing customers that Cox cannot provide the advertised services in all areas;

–     Fraudulently misrepresenting the capabilities of its high speed internet to potential and existing customers; and

–     Engaging in trade practices that offend established public policy and are immoral, unethical oppressive, unscrupulous, or substantially injurious to customers.

74.     Plaintiff seeks an order awarding actual damages, attorney's fees and costs, and, because Cox engaged in the conduct alleged herein deliberately and with willful and malicious intent, statutory penalties.  The total amount of damages suffered by Plaintiff and the class will be proved at trial.

75.     Plaintiffs also seek an order enjoining Cox from violating the LUTPA by 1) continuing to advertise a service that it cannot provide in all service areas, 2) charging

customers for a service that it is not providing; 3) failing to communicate to all potential and existing customers that it cannot provide the services as advertised, 4) fraudulently misrepresenting the capabilities of its high speed internet to potential and existing customers and 5) engaging in trade practices that offend established public policy and are immoral, unethical oppressive, unscrupulous, or substantially injurious to customers.

76.    By committing the acts and practices alleged herein, Cox has engaged in unlawful, fraudulent, and unfair business practices in violation of the LUTPA.

77.    Cox's violations of the LUTPA continue to this day.  As a direct and proximate result of Cox's violations of the LUTPA, Plaintiff has suffered actual damage in that, *inter alia*, he paid more for the Service than he would have had Cox not represented that the Premier service could reach internet speeds of up to 37 mbps.  Likewise, Plaintiff and the Class paid for a service that Cox did not deliver.

78.    Pursuant to La.R.S. 51:1408 and La.R.S. 51:1409, Plaintiff and the class seek an order that (a) enjoins Cox from continuing to charge customers for a service that it cannot provide; (b) requires Cox to honor the terms of Subscriber Agreement and other policies; (c) enjoins Cox from continuing to make false representations regarding the characteristics and scope of its services; (d) requires Cox to make full restitution of all moneiess wrongfully obtained from its violations of the LUTPA, as alleged in this Complaint; (e) requires Cox to pay Plaintiff and the class members statutory penalties; and (f) requires Cox to pay Plaintiff's and the class's attorney fees and costs.

## Count 2 - Violation of La. R.S. 51:411, *et. seq*.

79.     Plaintiff re-alleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

80.     Cox displayed a number of advertisements regarding its high speed internet that were "untrue, deceptive, or misleading" in violation of La. R.S. 51:411.  Cox advertises that the Premier service can reach "[s]peeds up to 30 Mbps with PowerBoost®."[10]

81.     However, Cox does not explain that such speeds can only be reached at "non-peak" hours and that, even during those hours, 30 Mbps speeds are rare.  Further, Cox does not tell its customers that these internet speeds rely on a number of factors, many of which are not under Cox's control.

82.     Yet, Cox charges its customers a $26.00 upcharge for increased internet speed that it cannot provide.

83.     Cox is therefore subject to the statutory penalties outlined in LA. R.S. 51:411 for such false advertising and La. R.S. 51: 1409.

## Count 3 - Breach of Contract

84.     Plaintiff re-alleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

---

[10]  http://ww2.cox.com/residential/greaterlouisiana/internet.cox (12/6/10)

85.     Plaintiff entered into a written or implied contract with Cox to pay monthly fees to obtain the Service, which Cox promised will provide high speed access to the internet for uploads and downloads at specified speeds.

86.     Plaintiffs performed their obligations under the contract by paying their monthly fees and by not engaging in any activities prohibited by the Agreement. Nevertheless, Cox unjustifiably breached the contract by restricting Plaintiffs' access to, and use of, the Service at the speeds promised in the Agreement.

87.     In fact, Cox entered into a contract with Plaintiff and the class to provide services it simply could not and cannot provide.

88.     Plaintiffs were damaged by Cox's breach of the contract in that they did not receive the Service for which they paid, and are therefore entitled to damages for that breach.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for relief in this Complaint as follows:

1.     For an order certifying the action as a class action, on behalf of the proposed class pursuant to Federal Rules of Civil Procedure 23;

2.     For an award of actual damages and restitution pursuant to La.R.S. 51:1408 and La.R.S. 51:1409;

3.     For an award of statutory penalties pursuant to La.R.S. 51:1409 and La.R.S. 51:411, including but not limited to treble damages;

4.      For an award of attorney fees pursuant to La.R.S. 51:1409;

5.      For an award of costs of these proceedings pursuant to La.R.S. 51:1409;

6.      For injunctive relief pursuant to La.R.S. 51:1408 and Federal Rules of Civil Procedure 23;

7.      For an award of pre- and post-judgment interest on any amounts awarded; and

8.      For any and all other relief the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff and the proposed class demand a jury trial in this action for all the causes of action so triable.

Respectfully Submitted,

**KEOGH, COX & WILSON, LTD.**

By:_____s/Christopher K. Jones_____
JOHN P. WOLFF, III, Bar #14504
CHRISTOPHER K. JONES, Bar #28101
VIRGINIA J. McLIN, Bar #31257
701 Main Street
Post Office Box 1151
Baton Rouge, Louisiana  70821
Telephone:  (225) 383-3796
Facsimile: (225) 343-9612
jwolff@kcwlaw.com
cjones@kcwlaw.com
jmclin@kcwlaw.com
***Attorneys for Plaintiff***