UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

JERRY A. WADE, Individually        CIVIL ACTION
and on Behalf of the Class        No. 11-45-BAJ-DLD

VERSUS        JUDGE BRIAN A. JACKSON

COX COMMUNICATIONS        MAGISTRATE JUDGE DOCIA
LOUISIANA, LLC, et al.        L. DALBY

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

This is a purported class action against Cox Communications Louisiana, LLC and

CoxCom, Inc. (together, "Cox") by a continuing subscriber to Cox's high-speed Internet service.

Simply put, Plaintiff's allegations cannot support his claims.  Plaintiff does not deny that

he was satisfied with the speed of his Internet service for at least a year after he purchased it in

2008 or that Cox responded to his complaints by attempting to resolve the issues, replacing

elements of his physical network connection, and ultimately providing complimentary service.

Plaintiff also does not dispute that Cox delivers Internet speeds without issue to the vast majority

of its Louisiana customers.  Plaintiff's complaint is that the network that supplies Internet service

in his immediate area allegedly becomes congested at times and, as a result, his speeds

temporarily slow down at certain times of day.  These allegations fail to supply any legal basis

for Plaintiff's unfair trade practice, criminal false advertising, breach of contract or negligent

misrepresentation claims.  In fact, many of the same arguments Plaintiff makes here were

rejected in a 2009 decision in the Southern District of California on very similar allegations.

Cutting through the rhetoric and conclusory statements, Plaintiff alleges that Cox offered

its Premier service with advertised speeds "up to" a certain level knowing it could not

continuously deliver those speeds, and that after a year Plaintiff's speeds decreased at "peak" hours when neighbors purchased the service and his immediate area became saturated at certain times.  However, Plaintiff does not and cannot identify any Cox statement that either promised to deliver *minimum* speeds or guaranteed the advertised "up to" *maximum* speeds always would be available.  These two alleged promises – implicit throughout the Complaint – are lynchpin elements of every claim asserted, but Plaintiff cannot identify any such promises that were actually made.  To the contrary, Cox made clear to subscribers that "[a]ctual speeds experienced will vary and uninterrupted or error-free service is not guaranteed." Ex. A at 2.  Even assuming Plaintiff was unable to receive maximum advertised speeds at times because of network congestion, that does not constitute egregious, deceptive, or misleading conduct, criminal false advertising, or a breach of promise.

In fact, the allegations in the Complaint require dismissal of the suit.  Initially, Plaintiff's claims are barred by Louisiana's voluntary payment doctrine, which bars recovery of payments made with knowledge of the relevant facts.  Plaintiff alleges that through repeated speed tests, he knew of the allegedly inadequate Internet speed performance for at least a year before filing suit but still paid for the service.  It is hard to imagine a stronger set of facts requiring application of Louisiana's voluntary payment doctrine.  Plaintiff paid for Internet service with full knowledge of the facts and cannot now sue to recover the money paid.

Plaintiff's claims also fail because they are all based on the implicit and false premise that Cox made representations and promises regarding minimum and maximum Internet speeds.  Plaintiff does not and cannot plead facts to support this premise, and his inability to identify any false promise or advertisement that either induced him to purchase Cox's Internet service or that was untrue when made is fatal to all of his claims.

In addition, most of Plaintiff's claims also are barred by specific statutes. The LUTPA claim (Count 1) cannot stand because the statute expressly bars private parties from proceeding in a representative capacity, and the claim is barred by the statute's one-year peremptive period. Plaintiff's criminal false advertising claim (Count 2) fails because, among other reasons, the statute does not create a private right of action or civil remedy. His negligence claim (Count 4) fails because it has prescribed. And Plaintiff's request for injunction (Count 5) is not a claim at all; it is a request for relief that falls once the substantive claims fall.

Finally, even if the claims were not dismissed with prejudice, the Court should stay or dismiss under the doctrine of primary jurisdiction pending the Federal Communications Commission ("FCC") regulatory process described in the Complaint. Internet speed has become a focus of federal policy as consumers have increased reliance on broadband services. Changes in Internet traffic, technology, and user behavior, including recent surges in downloading feature-length movies, streaming video, and the use of wireless routers to connect multiple devices to the same Internet connection have created challenges for provider networks. Although these issues are being resolved through network upgrades and improvements in technology, the FCC has initiated a proceeding to address whether and how to regulate disclosure of Internet speeds. Plaintiff believes this will result in rules governing the very types of alleged promises regarding Internet speeds he alleges here. The doctrine of primary jurisdiction was developed to address exactly this situation: Where an expert agency is considering issues central to the litigation and there is a risk of inconsistent and conflicting standards, regulation of the conduct, if any, should be on a uniform, national basis, not through a patchwork of judicial decisions.

## STATEMENT OF FACTS[1]

I.     <u>**Plaintiff's Allegations Regarding Cox's High-Speed Internet Service.**</u>

Cox is a cable provider offering high-speed Internet service to customers in certain communities in Louisiana.  Compl. ¶ 13.  Cox offers this service using a hybrid fiber coaxial ("HFC") system, *id.* ¶ 23, in which "fiber optic cables are laid from the headend to neighborhood nodes."[2]  In HFC systems, "[c]oaxial cables extend from the nodes to each subscriber's home," and cable operators "allocate a portion of their system's spectrum (i.e., bandwidth or channel capacity) for upstream and downstream data transmissions necessary for cable modem service."  17 F.C.C.R. at 4807.  As the FCC has recognized, because cable Internet "is a shared medium," customer Internet "speeds vary depending on the number of actual subscribers using the Internet connection at the same time" and the types of services and sites they are accessing or using.[3]

Plaintiff is a current Cox high-speed Internet subscriber.  Compl. ¶ 6.  He has subscribed to Cox's "Premier" Internet service since 2008.  *Id.* ¶¶ 6, 43, 45.[4]  In 2009, one year after signing up for Premier service, Plaintiff began to experience what he characterizes as "incredibly slow internet speeds during peak hours."  *Id.* ¶ 46.  This prompted Plaintiff to test the speed of his Internet service "at all times."  *Id.* ¶ 47.  Based on this testing, Plaintiff concluded that while he

---

[1]  This statement is based on the Complaint's allegations of fact, which Cox must assume but does not admit, and facts of which this Court may take judicial notice.

[2]  *In re Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, 17 F.C.C.R. 4798, 4807 (2002).  A headend is "the origination point for signals in the cable system" and "may also house equipment to connect the cable system to the Internet."  17 F.C.C.R. at 480 n.52 (internal citation omitted).  "Each local service area is typically served by one or more headends."  *Id.* (citation omitted).

[3]  *Comcast Cablevision of Broward County, Inc. v. Broward County, Fla.*, 124 F. Supp. 2d 685, 687 (S.D. Fla. 2000) (citing *Staff Report to William E. Kennard, Chairman, Federal Communications Commission on Industry Monitoring Sessions Convened by Cable Services Bureau,* October, 1999, *Broadband Today,* at 16); *Newman v. RCN Telecom Srvcs., Inc.*, 238 F.R.D. 57, 71 (S.D.N.Y. 2006) (recognizing that "internet speed depends on amount of bandwidth available, how many users are on the internet at the same time, and the web sites that the user is accessing").

[4]  According to the Complaint, Cox offers three levels of Internet service, Essential, Preferred, and Premier, each offering greater maximum Internet speeds.  Compl. ¶¶ 17-20.

was able to obtain speeds close to the maximum advertised speeds at non-peak hours, he was unable to do so during peak hours. *Id.* Plaintiff alleges that he experienced decreased Internet speeds during peak hours because the "node" serving his home was "over-saturated."[5] *Id.* ¶¶ 50, 55. Plaintiff attributes this over-saturation to "increased household [I]nternet usage." *Id.* ¶ 15. Plaintiff measured his Internet speeds for at least a year and found similar results. *Id.* ¶ 51.

When Plaintiff raised his performance concerns with Cox, Cox attempted to resolve them by, among other things, dispatching a technician to his home, providing new equipment and eventually providing him with complimentary Internet service. *Id.* ¶¶ 49, 53. Throughout this period, Plaintiff regularly paid what he was billed for his Internet service even though the service allegedly did not meet his standards. *Id.* ¶ 53.

## II.   The Alleged Promises In The Advertisements And Contract For Services.

Plaintiff does not identify any advertisement or other communication from Cox that prompted him to sign up for the Premier service in 2008. According to the Complaint, Plaintiff purchased the Premier service in 2008 and received the speeds he says he was promised until at least a year later (in 2009) when he noticed slower speeds during what he calls "peak" hours. Compl. ¶ 46. At that point, he started testing his speeds and complaining to Cox. *Id.* ¶¶ 47-49.

As the apparent basis for the representations Cox made about Internet speeds, the Complaint incorporates certain pages from Cox's website as they appeared in December 2010, approximately two years after Plaintiff signed up for Premier service. *See* Compl. ¶¶ 17-20 (referencing web pages as of 12/6/10). These webpages specify the **maximum** speed of the Premier tier.[6] Plaintiff does not and cannot allege that Cox advertises that this level of

---

[5] Each designated area in Cox's Louisiana system is served by a distinct node. Compl. ¶ 14. At times, Cox schedules certain nodes to be "split" to reduce the number of customers serviced per node. *Id.* ¶¶ 16, 50.

[6] *See* Ex. A. (http://ww2.cox.com/residential/greaterlouisiana/internet/premier-internet.cox); Ex. B (http://ww2.cox.com/residential/greaterlouisiana/internet.cox). Because these webpages and the other webpages

performance will be available at all times. *Id.* Rather, Cox advertises each service tier as capable of speeds "up to" certain levels but does not guarantee that these levels will always be available to customers, and Cox does not advertise or promise any minimum service speed. *Id.*

Cox makes known to all actual and potential customers that Internet speeds will vary, that service may be interrupted, and that at times Cox may have to manage the network in a manner that will affect service performance. Cox explains on its website that "[a]ctual speeds experienced will vary and uninterrupted or error-free service is not guaranteed." Ex. A at 2.

Cox's Subscriber Agreement with Plaintiff also provides that Cox may have to manage its shared network and will do so "for the greatest benefit of the greatest number of subscribers," which "may affect the performance of the Service from time to time . . . ."[7] None of the contract provisions Plaintiff identifies contain a promise that Cox will always make available the maximum Internet speeds or that any tier of Internet service guarantees minimum speeds.

### III.     The FCC Is Actively Considering Internet Speed Central to This Proceeding.

Internet speed recently has become an important focus as consumers have increased their use of broadband services. As the FCC has observed, "[o]nline viewing of video programming content is growing rapidly."[8] In fact, "Cisco expects online viewing to exert significant influence on future demand for broadband capacity, ranking as the top source of Internet traffic

---

attached as exhibits are referenced in and thereby incorporated into the Complaint, the Court may take judicial notice of them without converting this motion to dismiss into a summary judgment motion. *See United States ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 379 (5th Cir. 2003) ("In deciding a motion to dismiss the court may consider documents . . . incorporated in the complaint . . . .") (citation omitted). In addition, Cox has highlighted the relevant portions of its exhibits.

[7]  Ex. C (http://ww2.cox.com/aboutus/greaterlouisiana/policies.cox) at 5, Subscriber Agreement ¶ 15.

[8]  *In re Preserving the Open Internet*, Report and Order, 25 F.C.C.R. 17905, 17914 & n.41 (2010) (citing, among other sources, Sandvine press release announcing major findings from its Fall 2010 Global Internet Phenomena Report). The Sandvine Report on which the FCC relied reported that the share of North American peak period Internet traffic that real-time entertainment accounts for jumped from 29.5% in 2009 to 42.7% in 2010. *See* SANDVINE, FALL 2010 GLOBAL INTERNET PHENOMENA REPORT 13 (2010), *available at* http://www.sandvine.com/news/global_broadband_trends.asp#Download. In fact, the Report found that the streaming video service offered by Netflix alone now makes up more than 20% of peak period traffic. *Id.* at 15.

by the end of 2010 and accounting for 91% of global Internet traffic by 2014." *Id.*, n.41.  This recent rapid growth in video traffic, as well as Internet traffic generally,[9] requires constant monitoring and adjustments on provider networks.  While providers are addressing these issues, the FCC recently has conducted "extensive research and testing" of the speeds available to "residential households subscribed to internet services."  Compl. ¶ 39.[10]  Plaintiff predicts that the FCC will likely promulgate standards governing the disclosure and testing of "[a]ctual speeds and performance over the broadband service providers [sic] network," at peak and non-peak hours, among other things.   Compl. ¶ 41; *see also* OBI Technical Paper No. 4 at 13-14.

The FCC is actively considering these issues in the context of its National Broadband Plan, released in March 2010, which among other things proposed that new rules setting "performance disclosure requirements for broadband" be adopted.  *Connecting America:  The National Broadband Plan* (Fed. Commc'ns Comm'n, 2010) at 46-47.  As part of the Broadband Plan, the FCC has implemented a consumer speed test;[11] created a separate mobile broadband speed test application;[12] launched a technical advisory group to consider speed and performance issues;[13] begun a formal speed and performance measurement program through an outside vendor;[14] and opened a rulemaking on how best to collect information (including speed and other

---

[9]  *See* CISCO, *Cisco Visual Networking Index: Forecast And Methodology*, 2009–2014, at 7 (June 2, 2010), *available at* http://www.cisco.com/en/US/solutions/collateral/ns341/ns525/ns537/ns705/ns827/ white_paper_c11-481360.pdf (projected increase of nearly 40% in North American Internet traffic from 2009-10).

[10]  *See also* Broadband Performance, OBI Technical Paper No. 4, FCC, available at http://download.broadband.gov/ plan/fcc-omnibus-broadband-initiative-%28obi%29-technical-paper-broadband-performance.pdf.

[11]  *Consumer Broadband Test,* at http://www.broadband.gov/qualitytest/about/; *see also* Press Release, FCC, FCC Launches Consumer Broadband Tools (Mar. 11, 2010) (announcing consumer broadband speed test and mobile broadband speed test apps) (available at http://hraunfoss.fcc.gov/edocs_public/attachmatch/DOC-296810A1.pdf).

[12]  http://www.broadband.gov/qualitytest/about/ (referencing Iphone and Android mobile speed test applications).

[13]  Press Release, FCC, FCC Announces Formation of the Technological Advisory Council (Oct. 21, 2010) (available at http://www.fcc.gov/Daily_Releases/Daily_Business/2010/db1021/DOC-302336A1.pdf).

[14]  Press Release, FCC, *FCC Survey Finds 4 Out of 5 Americans Don't Know Their Broadband Speeds* (June 1, 2010) (announcing testing program); *see also Comment Sought on Residential Fixed Broadband Services Testing*

performance data) on broadband services.[15]  The FCC's schedule includes a rulemaking devoted to transparency in provider disclosures, including those related to speed.[16]  In addition, the FCC's new network neutrality rules (not yet in effect) require broadband providers to disclose the terms and conditions of service offerings, including "expected and actual access speed and latency."[17]  The FCC is continuing to refine these requirements.  Action concerning disclosures of Internet speeds is central to the FCC's broadband agenda and is still before the agency.

## ARGUMENT

On January 26, 2011, Plaintiff filed his Class Action Complaint for Damages and Injunctive Relief, alleging claims (1) under the Louisiana Unfair Trade Practices Act, (2) under Louisiana's criminal false advertising statute, and (3) for breach of contract.  On February 16, 2011, Plaintiff filed a First Supplemental and Amending Class Action Complaint for Damages and Injunctive Relief, which adds claims for (4) negligence and (5) injunctive relief.[18]

### I.    The Complaint Fails To State A Claim Under Fed. R. Civ. P. 12(b)(6).

A court must dismiss a cause of action that "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss, the plaintiff must plead enough facts "to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. ---, ---, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547

---

*and Measurement Solution, Pleading Cycle Established*, CG Docket No. 09-158, CC Docket No. 98-170, WC Docket No. 04-36, Public Notice, 25 F.C.C.R. 3836 (2010) (SamKnows project).

[15]  *Comment Sought on Measurement of Mobile Broadband Network Performance and Coverage*, Public Notice, 25 F.C.C.R. 7069 (2010).

[16]  *National Broadband Plan, Connecting America, Broadband Action Agenda*, at http://www.broadband.gov/plan/broadband-action-agenda.html#cgb-transdisc-nprm (2011) (Item 47); *see also Consumer Information and Disclosure*, Notice of Inquiry, FCC 09-68 (rel. Aug. 28, 2010).

[17]  *Preserving the Open Internet; Broadband Industry Practices,* Report and Order, GN Docket No. 09-191, WC Docket No. 07-52 (Fed. Comm's Comm'n 2010), ¶ 56.

[18]  The Supplemental Complaint only added allegations:  Paragraphs 89 and higher appear only in the Supplemental Complaint, and paragraphs 1 to 88 appear in the initial Complaint, which together are referred to as the Complaint.

(2007)).  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted).  Thus, courts "do

not accept conclusory allegations, unwarranted factual inferences or legal conclusions as true."

*Central Laborers' Pension Fund. v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 550 (5th Cir.

2007).  Judged by this standard, the Complaint must be dismissed.

### A.    The Voluntary Payment Doctrine Bars Plaintiff's Claims Because He Paid For Internet Service With Knowledge Of The Alleged Problems.

Plaintiff's claims are barred by Louisiana's voluntary payment doctrine.  For more than a

year, Plaintiff habitually measured the speed of his Internet service, decided it failed to meet his

personal standards, but nevertheless paid the charges for Cox's Internet service.

As Louisiana courts have long acknowledged, "there is no principle of law better settled

than that money voluntarily paid with knowledge of the facts cannot be recovered back." *Ken*

*Lawler Builders, Inc. v. Delaney*, 39,297 (La. App. 2 Cir. 1/28/05), 892 So. 2d 778, 780 (citing

*Hicks v. Levett*, 140 So. 276, 282 (La. 1932)).  The doctrine is well grounded in logic and public

policy.  Louisiana jurisprudence requires potential plaintiffs to resolve their disputes at the

earliest opportunity, rather than to pile up their claims and sue well after the fact.  *See Bickham v.*

*Washington Bank & Trust Co.*, 515 So. 2d 457, 460 (La. App. 1 Cir. 1987) (holding that Plaintiff

should have sought judicial relief in the first instance rather than repeatedly paid allegedly unjust

demands).  To allow recovery of voluntary payments would clog courts with litigation that might

have been avoided had the plaintiff contested the charge sooner:

> If, in every instance in which a man is in doubt as to which is the
> safe course to pursue, he can pay under protest and then sue to
> recover back, **it is difficult to see where litigation is to end**.  The
> law, therefore, wisely holds that a voluntary payment cannot be
> recovered back.

*Bickham*, 515 So. 2d at 460 (quoting *New Orleans & N.E.R. Co. v. Louisiana Const. & Imp. Co.*, 33 So. 51, 56 (La. 1902)) (emphasis added).

The doctrine is widely accepted in federal and state courts across the country. Courts frequently dismiss claims under the voluntary payment doctrine, where, as here, the facts underlying the application of the doctrine are plain on the face of the complaint.[19] The doctrine bars any claims predicated on the return of funds voluntarily paid. *Horne v. Time Warner Operations, Inc.*, 119 F. Supp. 2d 624, 628-30 (S.D. Miss. 1999), *aff'd*, 228 F.3d 408 (5th Cir. 2000) (voluntary payment doctrine barred lawsuit on eight legal and equitable causes of action); *Cook v. Home Depot U.S.A., Inc.*, 2007 WL 710220, at *9 (claims for unjust enrichment and money had and received barred by voluntary payment doctrine); *Butcher v. Ameritech Corp.*, 727 N.W.2d at 552-557 (statutory claims barred).

The reasoning in *Newman v. RCN Telecom Services, Inc.*, 238 F.R.D. 57 (S.D.N.Y. 2006), demonstrates precisely why Plaintiff's claims cannot proceed. In *Newman*, the plaintiff brought a putative class action on behalf of Internet subscribers who allegedly had not received the speeds they had been promised. *Id.*, 238 F.R.D. at 62. Like Plaintiff Wade, the plaintiff in *Newman* had measured his Internet speeds and concluded they were slower than what he believed he had been promised. *Id.*, 238 F.R.D. at 63, 70-71. In the context of a class certification motion, the trial court held that the plaintiff's claim was barred because he had continued to pay for the Internet service even though he had tested it and found it too slow:

---

[19] *See, e.g., Johnson v. Sprint Solutions, Inc.*, No. 3:08-CV-00054, 2008 WL 2949253, at *2-3 (W.D.N.C. Jul. 29, 2008), *aff'd on other grounds*, No. 08-1948, 2009 WL 4919363 (4th Cir. Dec. 18, 2009); *Cook v. Home Depot U.S.A., Inc.*, No. 2:06-cv-00571, 2007 WL 710220, at *9 (S.D. Ohio Mar. 6, 2007); *Butcher v. Ameritech Corp.*, 727 N.W.2d 546, 552-557 (Wis. Ct. App. 2006); *Harris v. ChartOne*, 841 N.E.2d 1028, 1032-1033 (Ill. App. Ct. 2005); *Dillon v. U-A Columbia Cablevision of Westchester, Inc.*, 790 N.E.2d 1155, 1156 (N.Y. 2003). *See also Hassen v. MediaOne of Greater Fla., Inc.*, 751 So. 2d 1289, 1290 (Fla. Dist. Ct. App. 2000); *Sanchez v. Time Warner, Inc.*, No. 98-211-CIV-T-26A, 1999 WL 1338446, at *1-2 (M.D. Fla. Sept. 27, 1999); *McWethy v. Telecomm'n, Inc.*, 988 P.2d 356 (Okla. Civ. App. 1999).

> Th[e] [voluntary payment] doctrine would bar recovery by any …
> subscriber who, having experienced slower than advertised service,
> continued to pay for and use [the] high speed internet service.

*Id.* at 78.  The court found that Mr. Newman fell "squarely within" this description because he

had performed Internet speed tests, saw that he was "only receiving data at approximately 5

Mbps," but continued to pay his bills.  *Id.*; *accord Solomon v. Bell Atl. Corp.*, 777 N.Y.S.2d 50,

56 (N.Y. App. Div. 2004) (in lawsuit challenging disclosures regarding speed of defendant's

DSL Internet service, voluntary payment doctrine "would bar recovery by any subscriber who,

having experienced slow service . . . , continued to use defendants' DSL service").

The Complaint establishes the applicability of the voluntary payment doctrine.  Plaintiff

alleges that a year after he first purchased Cox's "Premier" tier in 2008, his service became

"incredibly slow" during certain hours.  Compl. ¶¶ 43, 45, 46.  Consequently, Plaintiff decided to

"perform speed tests on the internet service at all times," as a result of which he "noted that the

internet speeds drastically decreased during peak hours."  *Id.* ¶ 47.  Plaintiff alleges he

accumulated "a year's worth of speed test data" showing these decreased speeds.  *Id.* ¶ 51.

Plaintiff also alleges that he nevertheless paid his bills for the service.  *Id.* ¶ 53.  Because he paid

the amounts charged for Internet service after he had already gained knowledge of the problems

on which he now sues (allegedly substandard speeds), Plaintiff cannot now recover those

payments based on the alleged insufficiency of the speeds.  Because Plaintiff's claims are all

based on this theory, they are all barred by the voluntary payment doctrine.

**B.**     **Plaintiff's LUTPA Claim Must Be Dismissed.**

**1.**     **LUTPA Expressly Bars Claims On Behalf Of A Class.**

Count 1 must be dismissed because LUTPA specifically bars private class actions:

> Any person who suffers any ascertainable loss of money or
> movable property, corporeal or incorporeal, as a result of the use or
> employment by another person of an unfair or deceptive method,

> act, or practice declared unlawful by R.S. 51:1405, may bring an
> action **individually but not in a representative capacity** to
> recover actual damages.

La. Rev. Stat. § 51:1409(A) (emphasis added).

State and federal courts agree that this clear language bars class actions by private persons under LUTPA.  *See, e.g., Morris v. Sears, Roebuck & Co.*, 99-CA-2772 (La. App. 4 Cir. 5/31/00), 765 So. 2d 419, 421 (LUTPA "expressly prohibits a private class action."); *Grant v. Houser*, C.A. Nos. 10-805, 10-872, 2010 WL 3303853, at *6 (E.D. La. Aug. 17, 2010) ("LUTPA prohibits class action claims.") (citation omitted).  Thus, Plaintiff's class claim under LUTPA must be dismissed.  *Suffern v. Countrywide Home Loans, Inc.*, C.A. No. 06-0358, 2006 WL 1999204, at *2 (E.D. La. July 14, 2006) (dismissing "all class claims based on LUTPA").

### 2.      Plaintiff Fails To Plead A LUTPA Claim.

Plaintiff also fails to state a claim under LUTPA.  Among other reasons, he cannot allege any false promise that either induced him to purchase Cox's service or was untrue when made. Plaintiff claims that network congestion at times slowed his service below speeds he expected when he first purchased Premier, but he cannot identify any statements by Cox that this would never occur.  To the contrary, Cox's advertisements and contracts made clear that it might.

To state a claim under LUTPA, a plaintiff must allege, among other things, that he "suffer[ed] an ascertainable loss . . . as a result of the use or employment by another person of an unfair or deceptive method, act or practice."  La. Rev. Stat. § 51:1409(A).  "[O]nly egregious actions involving elements of fraud, misrepresentation, deception, or other unethical conduct will be sanctioned based on LUTPA."  *Cheramie Servs., Inc. v. Shell Deepwater Prod., Inc.*, 2009-1633 (La. 4/23/10), 35 So. 3d 1053, 1060.  Plaintiff makes two attempts to meet this standard, both of which fall short as a matter of law.

a.     Fraudulent Inducement.  Plaintiff alleges that Cox misrepresented the performance of its Internet service and thereby fraudulently induced him to sign up for the Premier service in 2008.[20]  This theory fails for several reasons.  First, Plaintiff concedes that Cox delivered the Premier service at the speeds at which it was advertised for at least a year after he first purchased it.  *See* Compl. ¶ 46 (slow internet speeds commenced "a year after" Plaintiff ordered Premier service).  Plainly, Plaintiff could not have been fraudulently induced to purchase a service that he admits Cox delivered as promised for at least a year.

Second, Plaintiff cannot identify any false Cox statement in or before 2008 that caused him to purchase the Premier service.  While Plaintiff references a number of webpages that (accurately) describe Cox's Internet service, Compl. ¶¶ 18-20, those webpages date from December 2010 and could not have led him to purchase the Premier service two years earlier.  The only statement regarding Cox's Internet service identified in the Complaint from 2008 or earlier is a third-party news report from December 2006, Compl. ¶ 23, but Plaintiff does not contend that report was false or that he read and relied on it before purchasing the Premier tier.

This omission is not trivial, especially because Plaintiff is alleging misrepresentation and fraud.  In such cases, Plaintiff is required not only to plead facts sufficient to establish the LUTPA claim, but also to plead such facts with particularity to put defendant on fair notice of the claim.  *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").[21]

---

[20]  *See* Compl. ¶ 77 (alleging that Plaintiff "suffered actual damage in that . . . he paid more for the Service" than he would have had Cox not represented that the Internet service could reach certain speeds); *see also id.* ¶ 73 (alleging that "Cox [f]raudulently misrepresent[ed] the capabilities of its high speed internet to potential . . . customers").

[21]  Because Plaintiff's claim is based on alleged misrepresentations, he must meet the heightened pleading requirements of Rule 9(b).  *See Pinero v. Jackson Hewitt Tax Servs., Inc.*, 594 F. Supp. 2d 710, 721 (E.D. La. 2009). By failing to identify any false statements in the relevant time period, Plaintiff has failed to discharge his obligation to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent."  *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 349 (5th Cir. 2002) (citing *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997)).

Third, Plaintiff's claim must be dismissed because he fails to plead **any** false statement by Cox, even outside the relevant time period.  The crux of the LUTPA claim is that Cox allegedly represented Plaintiff would consistently receive Internet service at specific speeds and that Cox allegedly knew it could not provide such speeds at certain times in certain locations.  But Plaintiff does not identify a single Cox advertisement representing that customers would consistently receive these speeds.  In fact, the pages from Cox's website upon which Plaintiff relies, Compl. ¶ 20, make clear that advertised speeds are **maximum** speeds that are temporary and only obtainable when bandwidth is available.  *See* Ex. B at 1 (stating Premier service offers "[s]peeds up to 30 Mbps with PowerBoost®" and explaining that PowerBoost "temporarily increases your download speeds for the first 18 to 22 Mb of a file when extra bandwidth is available.") (emphasis added); Ex. A at 1 (explaining that service offers "up to" certain limits).[22]

No one likes Internet congestion.  But alleging that heavy network traffic sometimes slows Internet speeds, even to the point where the advertised "up to" maximum cannot be achieved at certain times, is insufficient to allege egregious misrepresentation or fraud.  This is especially true when the advertisements and contract also explain in clear terms that the highest speeds are temporary and available only when the necessary bandwidth is available.  The statements Plaintiff identifies do not guarantee the speeds will always be available or that any

---

[22] *See also* Compl. ¶ 77 (asserting that Cox "represented that the Premier service could reach internet speeds of **up to** 37 mbps.") (emphasis added).  Plaintiff nowhere identifies when, where, or by whom this last representation of 37 mbps allegedly was made, and the Court need not credit it under Rule 9(b).  The allegation also can be disregarded as inconsistent with the more particularized allegations of the Complaint because it references a maximum speed that is higher than that referenced in the web pages incorporated in the Complaint.  *See In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-406 (S.D.N.Y. 2001) (holding that "court need not feel constrained to accept as truth conflicting pleadings . . . that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely" and collecting supporting authority).

minimum speeds will be available.  As Cox's website explains, "[a]ctual speeds experienced will vary and uninterrupted or error-free service is not guaranteed." Ex. A at 2.[23]

b.   <u>Breach of Promise.</u>  Plaintiff also alleges that Cox violated LUTPA because it failed to honor contractual promises to deliver certain Internet speeds.  *See, e.g.*, Compl. ¶ 77 (alleging that Plaintiff "paid for a service that Cox could not deliver"); *Id.* ¶ 78(b) (seeking an injunction to "require[] Cox to honor the terms of [the] Subscriber Agreement and other policies").  This claim also fails.  Plaintiff cannot manufacture a LUTPA claim from allegations that, at best, state a simple breach of contract claim.  As the Fifth Circuit recognizes, LUTPA "does not provide an alternate remedy for simple breaches of contract." *Turner v. Purina Mills, Inc.*, 989 F.2d 1419, 1422 (5th Cir. 1993).  "There is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes."  *Id.*[24]

Plaintiff's claim that Cox failed to deliver what it promised is the very essence of a breach of contract claim, and it falls far short of the LUTPA standard.  Plaintiff does not allege that he experienced any issues with his Internet service until a year after he had purchased Premier.  Compl. ¶ 46.  Even then, he admits he still could "reach speeds close to those [maximums] advertised in the Premier package outside of the peak hours," as he defines them. *Id.* ¶ 47.  Plaintiff further alleges that Cox attempted to work with him to resolve the issues when

---

[23]  No other document referenced in the Complaint represents that maximum speeds would always be available.  For example, paragraph 11 references a page that "invites customers to '[g]o high speed,'" but does not specify any speed level or availability.  Compl. ¶ 11; Ex. D at 1 (http://ww2.cox.com/residential/greaterlouisiana/home.cox). The same is true for the generic advertising referenced in paragraphs 24 and 25.  Compl. ¶ 24 ("Cox . . . . . . fastest internet period."); *Id.* ¶ 25 (Cox television ads promise an undefined "high speed internet performance pledge"). Even the third party news coverage cited at paragraph 23 of the Complaint does not make any claim that customers will always be able to reach maximum speeds.  *Id.* ¶ 23 (12/20/06 Multichannel News article).

[24]  *See also Cheramie Servs.*, 35 So. 3d at 1060 (quoting *Turner's* breach of contract language and stating: "Therefore, only egregious actions involving elements of fraud, misrepresentation, deception, or other unethical conduct will be sanctioned based on LUTPA."); *Schenk v. Living Centers-East, Inc.*, 917 F. Supp. 432, 439 (E.D. La. 1996) ("[T]he Court finds that the plaintiff has not provided any evidence that supports either the type or level of egregious conduct sufficient to support a LUTPA violation.  Mere breach of contract is not actionable under the LUTPA.") (citation omitted).

he raised them, *see, e.g., id.* ¶ 49, and ultimately provided him with complimentary service in an effort to satisfy an unhappy customer. *Id.* ¶ 52.

Plaintiff could have dropped his Cox Internet service at any time as a month-to-month customer. Plaintiff continued to purchase service from Cox after his speed issue arose, and he admits that Cox routinely performs network upgrades to address congestion issues like those he says he experienced. Compl. ¶ 16. And despite his assertions that his service did not meet his standards, Plaintiff willingly paid the amounts billed for Internet service. *Id.* ¶ 53. This type of simple breach of contract claim, devoid of egregious conduct, is not cognizable under LUTPA.

### 3.      Plaintiff's LUTPA Claim has Been Perempted.

Count 1 also should be dismissed because it has been perempted. LUTPA contains a one-year peremptive period "running from the time of the transaction or act which gave rise to this right of action." La. Rev. Stat. § 51:1409(E); *see also Reese v. ICF Emergency Mgmt. Servs., Inc.*, 684 F. Supp. 2d 793, 801 (M.D. La. 2010) (same). "Although the statute uses the word 'prescribed,' courts have interpreted this period to be peremptive rather than prescriptive." *Dileo v. Lakeside Hosp., Inc.*, C.A. No. 09-2838, 2010 WL 598604, at *2 (E.D. La. Feb. 17, 2010). "[P]eremption may not be renounced, interrupted, or suspended." La. Civil Code art. 3461.[25] Rather, peremption "totally destroys the previously existing right with the result that, upon expiration of the prescribed period, a cause of action or substantive right no longer exists to be enforced." *Pounds v. Schori*, 377 So. 2d 1195, 1198 (La. 1979).

Plaintiff predicates his LUTPA claim on his allegation that Cox fraudulently induced him to purchase Premier service in 2008. Compl. ¶¶ 73, 77. Thus, his claim arose (if it all) in 2008

---

[25] *See also Reese*, 684 F. Supp. 2d at 801 ("LUTPA claims are subject to a *peremptive* period, the equitable doctrine of *contra non valentem* simply does not apply to those claims.") (emphasis in original).

when he first purchased Premier service. *Id.* ¶ 43.[26]  Because Plaintiff did not file this action

until January 26, 2011, well over a year after his claim purportedly arose, his LUTPA claim is

barred by the one-year peremptive period of La. Rev. Stat. § 51:1409(E).

Louisiana's "continuing tort" doctrine does not save Plaintiff's LUTPA claim.  First,

because LUTPA claims are subject to a one-year peremptive period, the continuing tort doctrine

does not apply.  *See Glod v. Baker,* 2004-1483 (La. App. 3 Cir. 3/23/05), 899 So. 2d 642, 647.[27]

Second, even if the doctrine were available it would not apply here.  A continuing tort is one

"where the operating cause of injury is a continuous one and gives rise to successive damages."

*Miller v. Conagra, Inc.*, 2008-0021 (La. 9/8/08), 991 So. 2d 445, 456 (citation omitted).  It must

be "occasioned by unlawful acts, not the continuation of the ill effects of an original, wrongful

act." *Id.*  The only relevant alleged wrongful acts for LUTPA purposes are the allegedly false

statements that caused Plaintiff to purchase Premier service in 2008.  These statements did not

cause Plaintiff damages in 2008, much less continuing damages, because he admits he received

the service without issue for at least a year.  Thus, whatever his dissatisfaction in 2009, it cannot

be traced continuously back to an allegedly unfair practice in 2008 actionable under LUTPA.[28]

---

[26]  Plaintiff's allegation that one year *after* he signed up for the Premier service his service slowed down is not cognizable under LUTPA because it is a breach of contract claim.  Accordingly, that allegation is irrelevant for purposes of applying LUTPA's peremptive period.

[27]  Three years prior to *Glod*, the Fifth Circuit held that the continuing tort doctrine was applicable to claims under LUTPA.  *See Tubos de Acero de Mexico, S.A. v. Am. Int'l Inv. Corp.*, 292 F.3d 471, 481 (5th Cir. 2002).  As explained in *Glod*, the *Tubos* court relied on three cases from Louisiana's First Circuit to reach its conclusion.  However, these cases are inconsistent with the First Circuit's later recognition (in a case decided after *Tubos*) that peremptive periods are not subject to the continuing tort doctrine.  *See Saia v. Asher*, 2001-1038 (La. App. 1 Cir. 7/10/02), 825 So. 2d 1257, 1262 ("Plaintiffs' assertion that defendants' actions constituted a continuing tort thereby suspending 'prescription' is erroneous, as the time limitations provided by La. R.S. 9:5604 are peremptive and as such cannot be suspended. La. C.C. art. 3461.").  While other district courts in Louisiana have followed *Tubos*, none has analyzed the direct conflict between *Saia* and the prior decisions relied upon in *Tubos*.

[28]  The alleged misrepresentations in 2008 (and later) also cannot be a "continuous" cause of injury because Plaintiff alleges he measured his Internet speeds in 2009 and later and found them to be too slow.  Thus, more than a year before he filed suit Plaintiff learned Cox was not offering the Internet speeds he claims it advertised.  He cannot have been damaged as a result of reliance on representations that he allegedly already believed were inaccurate.

C.    **Plaintiff's Criminal False Advertising Claim Must Be Dismissed Because (1) There Is No Private Civil Right Of Action Under La. Rev. Stat. § 51:411, And (2) Plaintiff Has Failed Adequately To Plead A Violation Of The Statute.**

1.    **No Private Right Of Action Under La. Rev. Stat. § 51:411.**

Count 2 is a claim under Louisiana's criminal false advertising statute, prohibiting certain "untrue, deceptive, or misleading" statements, La. Rev. Stat. § 51:411(A), and it must be dismissed because that statute does not provide for a private right of action.  When a plaintiff seeks damages for violation of a criminal statute that provides no civil right of action, the court must dismiss the plaintiff's claim.  *See Kwan-Tai Corp. v. Mastercraft Printers, Inc.*, No. Civ. A. 00-3160, 2001 WL 487329, at *7 (E.D. La. May 7, 2001) (dismissing claims under "criminal statutes for theft and commercial bribery" because they "do not provide civil remedies").[29]  The statute here, La. Rev. Stat. § 51:411, provides only for criminal penalties of fine and imprisonment,[30] and not a private right of action.  Accordingly, Count 2 must be dismissed. *Kwan-Tai Corp.*, 2001 WL 487329, at *7.

Plaintiff also alleges that Cox is "subject to the statutory penalties outlined in" La. Rev. Stat. § 51:4109, Compl. ¶ 83, but that is incorrect.  Section 51:4109 is the private right of action specific to and found in LUTPA; it is not found in the criminal statute Plaintiff cites, La. Rev. Stat. § 51:411.  In fact, there are specific instances where the Louisiana Legislature deliberately added this private right of action to a particular statute, thus creating a private right of action for

---

[29]  *See also Gulf Coast Autoplex, LLC v. Gen. Motors Corp.*, Civ. A. 2:08-CV-779, 2008 WL 4558212, at *2 (W.D. La. Oct. 9, 2008) ("Because binding federal precedent has established that the [Louisiana Motor Vehicles Act] provides no private right of action, the plaintiffs' LMVA claim is dismissed . . . ."); *Tranchina v. Howard, Weil, Labouisse, Friedrichs, Inc.*, Civ. A. 95-2886, 1996 WL 312026, at *5-6 (E.D. La. June 7, 1996) (granting motion to dismiss Louisiana Blue Sky Law § 712(D) claim because § 712(D) provided no private right of action).

[30]  *See* La. Rev. Stat. § 51:411(E) ("Whoever violates this Section shall be fined not less than five hundred dollars nor more than twenty-five hundred dollars or imprisoned for not less than ten days nor more than six months, or both for each offense.").

violations of those statutes.[31]  In contrast, the Legislature has not added that private right of action to La. Rev. Stat. § 51:411, and Plaintiff's attempt to write it into the statute must fail.

**2.      Plaintiff Has Not Pled A Violation Of The Criminal False Advertising Statute.**

Even if there were a private right of action under Louisiana's criminal false advertising statute, Plaintiff has not identified any "untrue, deceptive, or misleading" statement by Cox.  *See* La. Rev. Stat. § 51:411(A).  For this element, Plaintiff relies exclusively on Cox's statement that the Premier service offers "[s]peeds up to 30 Mbps with PowerBoost®."  Compl. ¶ 80 (citing Ex. B).  As explained in Section I.B. above, however, this statement does not guarantee minimum speeds or that the maximum speed will always be available.  Indeed, Cox specifically notifies subscribers that "[a]ctual speeds experienced will vary and uninterrupted or error-free service is not guaranteed."  Ex. A at 2.  The fact that Plaintiff was, at times, allegedly unable to receive the maximum Internet speeds because of network congestion does not equate to an allegation that Cox's advertisement of maximum speeds was false, deceptive, or misleading.

**D.      Plaintiff's Breach Of Contract Claim Must Be Dismissed Because He Has Failed To Allege Any Actual Breach Of A Promise By Cox.**

Plaintiff's breach of contract claim fails because he cannot identify any contractual promise that Cox breached.  Plaintiff makes much of the slow speeds he has experienced at certain times, but he cannot and does not deny that Cox plainly disclosed that network management issues might arise and that there were no minimum or maximum speed guarantees.

"To properly plead a cause of action based on breach of contract, a [p]laintiff must allege an identifiable contractual promise that [the defendant] failed to honor."  *Morris v. Countrywide Home Loans,* No. 06-5472, 2008 WL 638615, *4 (E.D. La. March 5, 2008) (citing *Miller v.*

---

[31]  *See, e.g.*, La. Rev. Stat. § 51:413(B) ("Any violation of this Section shall be enforceable under the provisions and subject to the penalties of [LUTPA]."); La. Rev. Stat. § 51:414(C) (same).

*Loyola Univ. Of New Orleans*, 02-158 (La. App. 4 Cir. 9/30/02), 829 So. 2d 1057, 1062)).[32]

Where a plaintiff fails to plead "a specific contractual provision" that the defendant has

breached, the plaintiff's claim "fail[s] to plead sufficient factual allegations . . . to raise a right to

relief above the speculative level" and accordingly must be dismissed.  *Wright v. CitiMortgage,*

*Inc.*, Civ. A. No. 09-482, 2010 WL 744919, at *3 (W.D. La. Mar. 1, 2010).

      Plaintiff fails to identify any specific contractual provision that Cox breached.  Instead,

Plaintiff makes general allegations that Cox promised to "provide high speed access to the

[I]nternet for uploads and downloads at specified speeds," Compl. ¶ 85, and that Cox breached

this obligation because it purportedly "restrict[ed] Plaintiffs' access to, and use of, the Service at

the speeds promised in the Agreement," *id.* ¶ 86.[33]  In paragraph 30, Plaintiff alleges that these

"specific Internet access speeds" are found in Cox's terms of service, which form part of his

contract with Cox.[34]

      The only portion of the contract referenced in the Complaint that actually references

particular Internet speeds, however, is in the Features and Limits of Service section,[35] referenced

in the Cox High Speed Internet Acceptable Use Policy.  *See* Ex. C at 2, ¶ 12.  That document

lists the "Maximum" speeds available for various tiers of the service but does not specify any

minimum speeds or promise that the maximum speeds will always be available.  Ex. E at 1.[36]  To

attempt to overcome this obstacle, Plaintiff contends that he "reasonably believe[d] that each tier

---

[32]  *See also Louque v. Allstate Ins. Co.*, 314 F.3d 776, 782 (5th Cir. 2002) (citing *Bergeron v. Pan Am. Assurance Co.*, 98-2421 (La. App. 4 Cir. 4/7/99), 731 So. 2d 1037, 1045) (same).

[33]  Despite this phrasing, Plaintiff apparently does not mean to suggest that Cox took any affirmative action to "restrict[]" his Internet access speed.  Rather, Plaintiff alleges that he could not obtain maximum Internet speeds during peak hours because the node that supplied his Internet access was "over-saturated."  *See, e.g.*, Compl. ¶ 26.

[34]  The only contract documents identified in the Complaint are the Cox Terms and Conditions of Service, Subscriber Agreement, and Acceptable Use Policy.  *See* Compl. ¶¶ 27, 28.  The Court may take judicial notice of these documents, and the terms incorporated in them.  *Willard*, 336 F.3d at 379.

[35]  *See* Ex. E at 1 (http://ww2.cox.com/aboutus/policies/limitations.cox).

[36]  *See also* Ex. E at 6 ("PowerBoost® temporarily increases your download speed for the first 18 to 22 megabytes of a file when extra bandwidth is available.").

of [Internet] Service w[ould] attain a minimum speed that is at least as fast to [sic] the maximum speed promised for the tier below."  Compl. ¶ 30.

Plaintiff's allegations are insufficient to state a claim for breach of contract.  In fact, these allegations are almost identical to those raised in *Lyons v. CoxCom, Inc.*, 718 F. Supp. 2d 1232 (S.D. Cal. 2009), which the court found insufficient to support a breach of contract claim.  The customer in *Lyons* alleged that CoxCom had breached a contractual obligation to provide Internet service at promised speeds because its use of traffic management software allegedly slowed Internet speeds for certain file-sharing applications.  Like Plaintiff Wade, the customer in *Lyons* pointed only to those provisions of her contract that identified maximum Internet speeds.  Construing exactly the same provision referenced by Plaintiff Wade in paragraph 30 of the Complaint, the *Lyons* court held that the plaintiff had failed to identify any term of her contract that CoxCom had breached:

> The Court concludes that Plaintiff fails to sufficiently plead a breach of contract, as she **points to no term of the contract that was breached by Cox**.  Plaintiff alleges that Cox promised specific speeds of internet access, but as Plaintiff alleges in her complaint and as the Limitations of Service state, **the speeds are maximum speeds attainable by each tier of service, not a promise that at all times a customer's service will deliver those maximums**.

*Id.*, 718 F. Supp. 2d at 1238 (emphasis added).

In addition, the *Lyons* court rejected the customer's contention (copied nearly word for word by Plaintiff Wade in his Complaint at ¶ 30) that "she reasonably believed, based upon the fact that each progressive tier of the service costs more, that each tier of the service will attain a minimum speed that is at least as fast as the maximum speed promised for the tier below."  *Id.* at 1238.  The court rejected this argument, holding that "Cox never promised a minimum speed for each tier of service and such an implied term" could not be read into the contract.  *Id.* at 1239.

The same logic requires dismissal of Plaintiff's claim here.  Just as in *Lyons*, Plaintiff's contract with Cox did not promise that the maximum speed for Premier service would always be available nor that Plaintiff would receive any particular minimum speed.  The promise made – that Premier service had a temporary "Maximum" speed – was not breached.  Plaintiff does not deny that he experienced adequate speeds for the first year of Premier service, and he concedes that even after he began to experience slower speeds during peak hours, Compl. ¶ 46, he still was able to obtain close to the maximum speeds during non-peak hours, *id.* ¶ 47.  Because Plaintiff has not identified any provision of his contract that was breached, *see Lyons*, 718 F. Supp. 2d at 1238, his claim must be dismissed.  *Wright*, 2010 WL 744919, at *3.

There is a second, independent basis for dismissal of Plaintiff's breach of contract claim.  The provisions of his contract expressly negate the existence of any promise to provide any guaranteed level of service.  Cox's terms of service plainly disclose in bold print that Cox does NOT warrant that "THE SERVICE WILL BE UNINTERRUPTED OR ERROR FREE" or that "ANY DATA OR ANY FILES SENT BY OR TO YOU WILL BE TRANSMITTED IN UNCORRUPTED FORM OR WITHIN A REASONABLE PERIOD OF TIME."  Ex. C at 5, Subscriber Agreement ¶ 13 (emphasis in original).  These notices also defeat Plaintiff's claim that Cox failed to deliver promised speeds.  *See Lyons*, 718 F. Supp. 2d at 1239.[37]

In addition, Plaintiff's contract acknowledges that Cox will manage its network and that this might affect the performance of the Service at times:

---

[37]  Plaintiff also contends that because the Subscriber Agreement permits Cox to manage its network at certain times, he was implicitly promised unlimited use of the Internet service at the maximum speeds at all other times. *See* Compl. ¶¶ 33-36.  This is illogical and appears to have been copied verbatim from the failed Complaint in the *Lyons* case.  *See Lyons*, 718 F. Supp. 2d at 1238 ("Plaintiff also alleges that by specifically enumerating the circumstances in which Defendant reserves the right to manage the network, Defendant implicitly promises Plaintiff that they will have otherwise unlimited use of the service at the promised speeds.").  This is not the *Lyons* case, however, and Plaintiff here does not allege that Cox used traffic shaping software to reduce the Internet speeds available to him.  These copied allegations (rejected in *Lyons*) have no application in this case.

> Cox manages its network for the greatest benefit of the greatest number of
> subscribers.  The network management actions implemented by Cox may affect
> the performance of the Service from time to time, although Cox strives to
> minimize any impact.

Ex. C at 5, Subscriber Agreement ¶ 15.  As a matter of fair network management, Cox allows

multiple users to share its broadband network, which sometimes causes congestion.  *Id.*  As

Plaintiff acknowledges, Cox also strives to improve the network, splits nodes and replaces

physical network elements to improve customers' experience, and, in Plaintiff's case, Cox

provided complimentary Service because Plaintiff was still dissatisfied.  Compl. ¶¶ 16, 49, 53,

54.  This is entirely consistent with the contract provisions Plaintiff has identified.

### E.   Plaintiff's Negligence Claim Must Be Dismissed Because It Has Prescribed And Fails To State A Claim.

#### 1.   Count 4 Has Prescribed.

Plaintiff's Negligence Claim (Count 4) must be dismissed because it has prescribed.

"The Louisiana Civil Code set a one-year prescriptive limit for all negligence actions."  *See*

*Connell v. Allstate Ins. Co.*, No. 06-4820, 2007 WL 4233830, at *5 (E.D. La. Nov. 28, 2007)

(citing La. Civil Code art. 3492).[38]  "The one year prescriptive period commences to run on the

date that an injured party discovers or should have discovered the facts on which to base a cause

of action."  *Netherland v. Ethicon, Inc.*, 35,229 (La. App. 2 Cir. 4/5/02), 813 So. 2d 1254, 1260.

"When a party has sufficient information to incite curiosity, to excite attention or to put a

reasonably minded person on guard and call for inquiry, he or she has the constructive

knowledge necessary to start the running of the prescription."  *Id.*

---

[38]   Negligent misrepresentation is also subject to the one-year prescriptive period in Civil Code Article 3492.  *See*
*Nat'l Council on Compensation Ins. v. Quixx Temp. Srvcs., Inc.*, 92-3336 (La. App. 2 Cir. 3/27/95), 665 So. 2d 120,
122 ("The action for negligent misrepresentation arises *ex delicto* and is subject to the one year prescriptive period
of Civil Code article 3492.") (citation omitted).

As alleged in his Complaint, "Plaintiff purchased the Premier internet package sometime in 2008," Compl. ¶ 43, and "about a year after . . . noted incredibly slow internet speeds," *id.* ¶ 46, "began to perform speed tests," *id.* ¶ 47, and ultimately accumulated "**a year's worth** of speed test data that showed poor performance," *id.* ¶ 51 (emphasis added).  Because all this occurred more than a year **before** filing suit, Plaintiff "discovered the facts on which to base a cause of action" before filing, and his claim has prescribed.  *Netherland*, 813 So. 2d at 1260.[39]

## 2.   Count 4 Fails To State A Claim For Negligent Misrepresentation.

Count 4 also must be dismissed because it fails to state a claim.  Though labeled "negligence," Count 4 is an attempt to plead negligent misrepresentation because it focuses solely on Cox's allegedly false and misleading representations regarding its Internet service.  *See* Compl. ¶ 90 ("Cox negligently . . . made material and false and misleading representations to Plaintiff and the Class . . . .").  Claims for negligent misrepresentation must establish:

> (1) [T]here must be a legal duty on the part of the defendant to supply correct information; (2) there must be a breach of that duty, which can occur by omission as well as by affirmative misrepresentation; and (3) the breach must have caused damages to the plaintiff based on the plaintiff's reasonable reliance on the misrepresentation.

*Keenan v. Donaldson, Lufkin & Jenrette, Inc.*, 575 F.3d 483, 490 n.15 (5th Cir. 2009) (quotation omitted).  Importantly, the negligent misrepresentation must be over a "failure to provide correct information about **existing facts**"; no liability can exist unless a statement was inaccurate when made.  *Ethyl Corp. v. Gulf States Utils., Inc.*, 01-2230 (La. App. 1 Cir. 10/2/02), 836 So. 2d 172, 178 (emphasis added).

---

[39]  The continuing tort doctrine is inapplicable to Count 4.  After Plaintiff's service became slow he continued to purchase it although he could have terminated service at any time.  Thus, the alleged misrepresentations could not have been a cause or continuing source of injury to Plaintiff, and he cannot satisfy the continuing tort doctrine.

Count 4 fails to state a claim for negligent misrepresentation for at least three reasons. First, it is readily apparent from the Complaint that none of the alleged misrepresentations were false at the time Plaintiff claims he relied on them. Plaintiff purportedly relied on alleged misrepresentations in 2008 when he decided to purchase the Premier tier. Compl. ¶ 45. He further alleges, however, that his Internet service did not become unacceptably slow until "about a year" later. *Id.* ¶ 46. Thus, Plaintiff does not and cannot dispute that, at the time Cox allegedly made the representations about Internet speeds and he signed up for service, they were true. Second, for the reasons discussed in Section I.D. above, the representations about Internet speeds were accurate, and Plaintiff has not alleged facts showing they ever became false. And finally, Plaintiff cannot plead a causal link between a false statement and any damages.[40]

### F.   Requesting Injunctive Relief Does Not State An Independent Claim.

Plaintiff's claim for Injunctive Relief (Count 5) also should be dismissed. "Injunctive relief, like damages, is a remedy requested by the parties, not a separate cause of action." *Cox Commc'ns PCS, L.P. v. City of San Marcos*, 204 F. Supp. 2d 1272, 1283 (S.D. Cal. 2002) (emphasis and citation omitted). Plaintiff's request for injunctive relief under La. Rev. Stat. § 51:1408 and Rule 23, Compl. ¶¶ 98, 99, is redundant of his request for these remedies in his prayer for relief.[41] Because injunctive relief is not an independent claim, Count 5 should be dismissed. *See* 204 F. Supp. 2d at 1283 (dismissing the cause of action for injunctive relief where injunctive relief was separately pled).

---

[40]  Plaintiff's claim also would fail if examined as a traditional negligence claim, which requires, among other elements, breach of a duty to conform conduct to a specific standard of care, causation and actual damages. *Pinero v. Jackson Hewitt Tax Serv., Inc.*, 594 F. Supp. 2d 710, 715 (E.D. La. 2009). Plaintiff has not pled a breach of duty because, for the reasons set forth above, the alleged misrepresentations were consistent with Cox's contract and were neither false nor misleading. They also could not have been the legal cause of any injury to Plaintiff.

[41]  Compl. at 25, Prayer for Relief ¶ 6; *see also id.* ¶¶ 75, 78 (Count 1 seeking injunctive relief under LUTPA).

The right to injunctive relief depends upon the existence of a substantive claim for which such relief is available. Once the underlying claims are dismissed, the dependent request for injunctive relief must fail.[42] Finally, Plaintiff cannot obtain injunctive relief under Federal Rule of Civil Procedure 23(b)(2) alone, as he seeks in paragraph 98. *See State Police for Automatic Retirement Ass'n v. Difava*, 164 F. Supp. 2d 141, 156 (D. Mass. 2001) (dismissing claim asserted under Rule 23 because "the Federal Rules of Civil Procedure do not create independently enforceable rights upon which [a plaintiff] may sue").[43]

## II.     If This Court Does Not Dismiss With Prejudice, It Should Stay Or Dismiss Under The Doctrine Of Primary Jurisdiction.

This Court should dismiss Plaintiff's claims in their entirety, with prejudice, for the reasons set forth above. The Complaint alleges that the network that supplies Plaintiff's Internet service allegedly becomes congested in his immediate area and, as a result, his Internet speeds slow down at certain times. These facts fail to supply any legal basis for his claims. The Complaint has not and cannot identify any false promise, advertisement, or representation.

Nevertheless, issues concerning statements of Internet speeds and related network management issues are central to the allegations in this case, and these issues fall squarely within the scope of an existing and technologically complex proceeding at the FCC. Indeed, the FCC is expected to make a determination of whether and how it will regulate such issues. Therefore, if this case were to proceed at all, the Court should stay or dismiss it pursuant to the doctrine of primary jurisdiction pending resolution of the FCC's on-going process.

---

[42]  *See Horne*, 119 F. Supp. 2d at 630 (dismissing "claim for declaratory judgment and injunctive relief" because "there [wa]s no underlying legal action upon which . . . Plaintiff may receive declaratory or injunctive relief").

[43]  Count 5 also should be dismissed because it impermissibly seeks class relief under LUTPA, *see* Compl. ¶¶ 98, 99, which bars private lawsuits in a "representative capacity." La. Rev. Stat. § 51:1409(a). Moreover, as a private party, Plaintiff cannot obtain the injunctive relief he seeks under LUTPA. *See Family Res. Grp., Inc. v. Louisiana Parent Magazine*, 818 So. 2d 28, 33-34 (La. Ct. App. 2001) (only Louisiana Attorney General may pursue LUTPA claim for injunctive relief); *L-3 Commc'ns Westwood Corp. v. Robicharux*, C.A. No. 06-297, 2007 WL 756528, at *10 (E.D. La. Mar. 8, 2007) (same).

The doctrine of primary jurisdiction "is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63 (1956). The doctrine "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Id.*, 352 U.S. at 64 (internal citation omitted). "[F]or an issue to fall within an agency's primary jurisdiction, the agency need not possess definite authority to resolve it; rather, there need only be sufficient statutory support for administrative authority that the agency should at least be requested to proceed in the first instance." *Comcast Corp. v. FCC*, 600 F.3d 642, 648 (D.C. Cir. 2010) (citing *Ricci v. Chicago Mercantile Exch.*, 409 U.S. 289, 304 (1973)) (internal punctuation omitted). "[I]n such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." *United States v. W. Pac. R.R. Co.*, 352 U.S. at 64. "In practice, a 'referral' means that the court either stays the case or dismisses it without prejudice" to allow for resolution of the matter by the agency. *See Centurytel of Chatham, LLC v. Sprint Comm'ncs. Co., LP*, Civ. A. No. 09-cv-1951, 2010 WL 5648871, at *4 (W.D. La. Dec. 15, 2010) (citing *Reiter v. Cooper*, 507 U.S. 258, 268 n.3 (1993)).

"No fixed formula exists for applying the doctrine of primary jurisdiction." *United States v. W. Pac. R.R. Co.*, 352 U.S. at 64; *see also Carter v. AT&T*, 365 F.2d 486, 498-99 (5th Cir. 1966) (embracing this proposition "fully and enthusiastically"). Rather, "[i]n every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *United States. v. W. Pac. R.R. Co.*, 352 U.S. at 64. The reasons to defer to an agency are to promote "desirable

uniformity" in the regulation of the matter to be addressed and also to allow courts to take advantage of the "expert and specialized knowledge of the agenc[y] involved." *Id.*[44]

Both goals of the primary jurisdiction doctrine would be advanced by staying or dismissing this case pending the outcome of the FCC's process.  First, there is a very real risk of inconsistent outcomes if this matter proceeds.  Plaintiff is asking this Court to regulate by injunction Cox's high-speed Internet advertisements.  *See* Compl. ¶¶ 75, 78, 95-99; *id.* at 25, Prayer for Relief ¶ 6.  Leaving aside that the Complaint has not and cannot allege any legal basis for injunctive relief, it would make little sense to establish new rules in this action when the FCC is expected to issue final rules of national scope governing disclosure of consumer Internet speeds.  *See* Compl. ¶¶ 38-42 (detailing some of the many FCC efforts to examine and regulate disclosure of Internet speeds and predicting the FCC soon will issue final rules on the matter).

Second, it is also clear that the FCC has "expert and specialized knowledge" regarding this subject matter that likely would be helpful to this Court.  As the Supreme Court has recognized, the regulation of cable Internet services "involve[s] a subject matter that is technical, complex, and dynamic."  *See Nat'l Cable & Telecomm'ncs. Ass'n. v. Brand X Internet Servs.*, 545 U.S. 967, 1002-03 (2005) (internal citation omitted).  Plaintiff challenges Cox's advertisement of the speeds offered on the various levels of its "three-tiered high-speed internet" service.  Compl. ¶ 11.  Each service level offers a different degree of PowerBoost® service that at times temporarily increases available Internet speeds.  *Id.* ¶¶ 22-23.  As Plaintiff recognizes, whether a user will obtain the maximum Internet speed depends on a number of factors, including the amount of data transmitted at any one time through individual "nodes" in Cox's

---

[44]   *See also S. Pac. Transport. Co. v. San Antonio, Texas*, 748 F.2d 266, 272 (5th Cir. 1984) (Primary jurisdiction "is designed to produce uniformity and bring agency expertise to bear on complicated technical questions.").

sophisticated high-speed Internet network.  *Id.* ¶¶ 14-16.  These are "complex[]" issues, *id.* ¶ 64, of a technical nature and, for this reason, the FCC's expertise would be helpful to this Court.

It is particularly important for a district court to stay litigation while concurrent administrative proceedings on the matters presented in the suit are still underway.  In *GTE.Net LLC v. Cox Commc'ns, Inc.*, 185 F. Supp. 2d 1141, 1147-48 (S.D. Cal. 2002), the court stayed a suit seeking to establish that Internet service should be deemed a "telecommunications service" under the Communications Act.  The FCC previously had issued a Notice of Inquiry to examine and resolve the "widespread and frustrating disagreement over the proper classification of [such] service."  *Id.* at 1145.  The court held that the FCC's involvement required a stay:

> The regulation of cable Internet involves complex issues with far-reaching consequences.  The issue is clearly not being taken lightly by the experts at the FCC, and this Court defers to that concern and pending investigation.

*Id.* at 1147.

Here too, the FCC's broad technical expertise and regulatory experience would be helpful to this Court if this litigation were to proceed.  As in *GTE.Net*, the FCC has taken up the issue at the heart of this case, i.e., regulation of the disclosure of consumer Internet speeds.[45]  As detailed above, the FCC is devoting substantial resources to this issue in connection with its National Broadband Plan.  *See National Broadband Plan, Connecting America, Broadband Action Agenda*, (2011) (Item 47).  Indeed, Plaintiff delineated some of these efforts in his Complaint, *see* Compl. ¶¶ 38-42, which highlights the scope of the FCC's proceedings.  Accordingly, this

---

[45]  A stay in this case would serve both goals underlying the primary jurisdiction doctrine, i.e., avoiding inconsistent results and promoting expertise and experience of the relevant agency.  However, in *Centurytel of Chatham*, 2010 WL 5648871, at *4, the court applied an alternative test, which also supports a stay here.  Disclosure of broadband speeds necessarily requires consideration of both technical and policy considerations over which the FCC has asserted jurisdiction; the FCC is already considering the issue and has asserted that the right to regulate disclosures is within its discretion; there is substantial danger of inconsistent rulings because the FCC and this Court might reach differing conclusions; and the FCC essentially is entertaining a prior application for guidance through its proceedings addressing the issue in this litigation.

Court should do as the court did in *Hart v. Comcast of Alameda*, No. C 07-6350, 2008 WL 2610787 (N.D. Cal. June 25, 2008), and stay the litigation pending resolution of the FCC's proceeding.[46]

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, Cox respectfully requests that its Motion to Dismiss be granted and that the Complaint be dismissed in its entirety with prejudice, or in the alternative that this case be stayed or dismissed pursuant to the doctrine of primary jurisdiction.

Respectfully submitted,

BY:      s/ Martin E. Landrieu

| | |
|---|---|
| DAVID E. MILLS (*pro hac vice*) | EWELL E. EAGAN, JR. (#5239) |
| SCOTT D. DAILARD (*pro hac vice*) | MARTIN E. LANDRIEU (#18995) |
| DANIEL D. PRICHARD (*pro hac vice*) | PHILLIP J. ANTIS, JR. (#29067) |
| **DOW LOHNES PLLC** | **GORDON, ARATA, McCOLLAM** |
| 1200 New Hampshire Ave., NW | **DUPLANTIS & EAGAN, LLC** |
| Suite 800 | 201 St. Charles Avenue, Suite 4000 |
| Washington, DC  20036-6802 | New Orleans, Louisiana  70170-4000 |
| Telephone:  (202) 776-2000 | Telephone:  (504) 582-1111 |
| Facsimile:  (202) 776-2222 | Facsimile:  (504) 582-1121 |

**Attorneys for Defendants Cox Communications Louisiana, LLC, and CoxCom, Inc.**

---

[46] *See id.*, at *2 (concluding that because "the FCC is already using its recognized expertise to consider some of the exact questions placed before the court here, in an effort to promote uniformity in internet broadband regulation," the court would stay action pending resolution of the FCC regulatory process).  The court stayed even those claims that did not directly address the issues before the FCC because they were "sufficiently interrelated" with the FCC's analysis and determination that they would likely directly affect the "basis for legal liability" against ISP providers. *Hart*, 2008 WL 2610787, at *2 (N.D. Cal. June 25, 2008).  Similarly, all of Plaintiff's claims directly relate to Cox's Internet speed disclosures or are sufficiently interrelated to require a stay.

<u>**CERTIFICATE OF SERVICE**</u>

I certify that I have served a copy of the above and foregoing Defendants' Memorandum in Support of Motion to Dismiss and its accompanying exhibits via Notice of Electronic filing using this Court's CM/ECF system to counsel of record participating in the CM/ECF system on this 8th day of April, 2011.

By:   s/ Martin E. Landrieu